United States District Court
Eastern District of New York

-----------------------------------X

United States of America,

- against -

Luis Leandro Ortiz Ribera,

Defendant.

-----------------------------------X

**Memorandum & Order**

No. 25-CR-346 (KAM)

**Kiyo A. Matsumoto, United States District Judge:**

Pending before the Court are two motions by Defendant Luis Leandro Ortiz Ribera ("Mr. Ortiz") to compel grand jury subpoenas and for the Court to hold a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972). Mr. Ortiz also requests a hearing pursuant to *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996).

In the first-filed motion, Mr. Ortiz asserts that the Government improperly reviewed "multiple [purportedly attorney-client privileged] communications between Mr. Ortiz and his employment lawyer . . . of the Major League Baseball Players' Association." (ECF No. 146-1 (sealed) at 1, ECF No. 147-1 (ex parte) at 1.) Mr. Ortiz moves to compel the grand jury transcripts so he can verify whether the Government "made use of privileged communications in obtaining the indictment." (ECF No. 146-1 at 10.) To prevent any further disclosure of any privilege, Mr. Ortiz served the Government only with a redacted version of his

memorandum of law in support of the instant motion. (*See id.* at 1 n.1.) The Government filed a response in opposition to the redacted filing on June 12, 2026. (*See* ECF No. 168 (sealed), 169 (ex parte).) Mr. Ortiz filed a reply on June 23, 2026, (ECF No. 174 (sealed)).

In the second-filed motion, Mr. Ortiz asserts that the Government had improperly reviewed Mr. Ortiz's purportedly marital-privileged communications with his wife in obtaining the indictment. (*See* ECF No. 182-1 (ex parte) at 1, ECF No. 244-1 (sealed) at 1.) Mr. Ortiz again asks the Court to order the Government to provide transcripts of the grand jury proceedings to ensure that "no tainted evidence was used before the grand jury," "hold a hearing under *Kastigar* . . . at which the government must prove that all its evidence was derived from legitimate, independent sources," and "simultaneously . . . hold a hearing under *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), to determine whether the government's conduct violated the Due Process Clause." (*Id.* at 3.) The Government filed a response in opposition on July 22, 2026. (*See* ECF No. 189 (ex parte), 190 (sealed).) Mr. Ortiz filed replies on July 29, 2026, and August 25, 2026. (*See* ECF No. 196 (ex parte reply), 244-2 (sealed reply), 207 (supplemental reply).)

For the reasons that follow, the Court respectfully **DENIES** both motions.

## Background

The Court assumes familiarity with the facts and procedural history of this case, which is set forth in the Court's February 2, 2026, September 8, 2026, and September 28, 2026, Memoranda & Orders. (ECF Nos. 75, 219, 260 (sealed)).

### I. Purportedly Attorney-Client Privileged Communications

On July 2, 2026, Major League Baseball ("MLB") requested information from the Major League Baseball Players Association ("MLBPA"), the "players' labor union" which "represent[s] the players' interests with MLB," in connection with MLB's investigation into certain online sports bettors and certain pitches thrown by Mr. Ortiz. (ECF No. 146-1 at 2.) A lawyer employed by MLBPA, Mr. Hiram Arnaud, facilitated Mr. Ortiz's response to MLB's information request. (*See id.*) The purportedly privileged communications were exchanged in a WhatsApp chat with Mr. Ortiz, Mr. Arnaud, and Mr. Ortiz's player agent, Josh Ramon. (*Id.*) A November 2025 indictment ultimately charged Mr. Ortiz with involvement in a pitch-rigging conspiracy based on two pitches thrown by Mr. Ortiz, one in the June 15, 2025 game against the Seattle Mariners, and the second in the June 27, 2025 game against the St. Louis Cardinals.

On July 11, 2025, the Government seized Mr. Ortiz's cell phone pursuant to a search warrant. At the time of the seizure, Mr. Ortiz incorrectly informed the agents that his lawyer was Mr.

Ramon, his player agent. (*See id.* at 5.) According to the Government,[1] on July 14, 2025, three days after the initial seizure of Mr. Ortiz's phone, Mr. Ortiz's counsel contacted the Government to ask about the status of Mr. Ortiz's seized device. (ECF No. 168 at 3.) Mr. Ortiz's counsel and the Government would continue to communicate on "several occasions" between July 14, 2025, and when the indictment was unsealed in November 2025. (*Id.*) According to the Government "[d]espite knowing that the [G]overnment was reviewing the phone for evidence of the scheme, at no time did counsel [for Mr. Ortiz] identify potentially privileged persons (Hiram Arnaud or otherwise) with whom their client communicated." (*Id.*)

The Government's opposition summarizes the "[p]rocess for reviewing [Mr. Ortiz's] phone," which is supported by a sworn affidavit by FBI Special Agent Amy Giarrusso. (*See* ECF No. 168-1, Exhibit A, "Giarrusso ACP Aff."). After Agent Giarrusso obtained the phone, she performed an initial responsiveness review by applying key word search terms and searching for contact information associated with subjects of the investigation. (*See id.* ¶ 6.) Messages returned as a result of those key word searches

[1] The Court notes that Mr. Ortiz's memorandum of law in support of his motion was heavily redacted, and the Government was, therefore, unable to address many of the substantive arguments made by Mr. Ortiz. (*See* ECF No. 168 at 15 ("The government is naturally constrained in its ability to assess whether the communications between the defendant, Arnaud, and Ramon were for the purpose of obtaining or providing legal advice because it appropriately has not reviewed the [purportedly privileged communications]." (internal quotations omitted).)

were coded as "responsive," and a subset of those messages were additionally coded as needing translation because they were in Spanish, a language which Agent Giarrusso does not understand. (*Id.*) The purportedly privileged communications between Messrs. Ortiz, Arnaud, and Ramon were among those tagged as requiring translation. (*Id.* ¶ 7.)

On or about October 27, 2025, Agent Giarrusso opened a document prepared by an FBI Language Analyst that contained summaries of draft translations of several message threads. (*Id.*) One of the summaries, (the "Subject Summary"), was of the group conversation thread at issue between Messrs. Ortiz, Arnaud, and Ramon. (*Id.*) After beginning to review the Subject Summary, Agent Giarrusso identified the exchange as containing potentially privileged material, so she immediately stopped reviewing and contacted an AUSA on the prosecution team. (*Id.* ¶¶ 7-8.) Although Mr. Ramon, who is not an attorney, appears to be in the thread and that Mr. Ortiz's defense counsel had not alerted the Government to the existence of potentially privileged information on Mr. Ortiz's phone, and notwithstanding that the Government had not determined whether Mr. Ortiz can "credibly claim a privileged relationship with an attorney for the MLBPA," the Government nonetheless directed Agent Giarrusso to "segregate all communications involving the names and phone numbers associated with [Messrs.] Arnaud and Ramon," out of "an abundance of caution." (ECF No. 168

at 4-5.) The Subject Summary was removed from the documents that had been prepared for the prosecution team's review. (Giarrusso ACP Aff. ¶ 9.) The same day that Agent Giarrusso was inadvertently exposed to potentially privileged material, she "memorialized . . . the steps she took to remedy [the] exposure," (ECF No. 168 at 5), which was filed by the Government as Exhibit B, (*see* ECF No. 168-2).

On December 11, 2025, the Government provided a forensic copy of the "responsive cut"[2] of Mr. Ortiz's phone to Mr. Ortiz in discovery. (*See* ECF No. 146-1 at 6.) Nearly one month later, on January 6, 2026, Mr. Ortiz's counsel informed the Government that the production "included privileged communications." (*Id.*) Namely, four messages from the thread between Messrs. Arnaud, Ortiz, and Ramon had been inadvertently included in the "responsive cut" produced by the Government despite Agent Giarrusso's efforts to segregate the material on or around October 27, 2025. (*Id.*; *see also* ECF No. 168 at 8-9 (noting that besides the four messages, which were in Spanish, the remainder of the WhatsApp messages between Messrs. Ortiz, Arnaud, and Ramon was not included in the responsive cut).) "Immediately after the call," an AUSA on the prosecution team informed the law enforcement agents assigned to device review what Mr. Ortiz's attorneys identified as potentially

[2] The "responsive cut" is the portion of the searched device that includes evidence that agents believe to be responsive to, or the object of, the search warrant.

attorney-client privileged communications in the "responsive cut" and directed them to stop reviewing Mr. Ortiz's phones while the Government obtained information from counsel needed to segregate the material. (Giarrusso ACP Aff. ¶ 14; ECF No. 168 at 7-8.) The Government then onboarded a filter AUSA and filter FBI agent.[3] (ECF No. 168 at 8.) On January 8, 2026, Mr. Ortiz provided search terms to the Government, and an AUSA on the prosecution team directed the filter agent to use those search terms to segregate the potentially attorney-client privileged material from the prosecution team and arrange for the preparation of revised reports of the phone's contents for the prosecution team's review. (Giarrusso ACP Aff. ¶ 16; ECF No. 168 at 7-8.) The agents did not regain access to Mr. Ortiz's devices until on or about January 21, 2026, after the segregation process by the filter team was complete. (*Id.* ¶ 19.)

The law enforcement agent on the filter team, FBI Special Agent Christian Isolda, executed his own affidavit, which was filed as part of the Government's opposition as Exhibit C. (*See* ECF No. 168-3, "Isolda Aff.") Agent Isolda affirmed that four messages were "inadvertently included in the initial responsive cut," (ECF No. 168 at 8; *see* Isolda Aff. ¶ 6(a)), and that historical

[3] A "filter team" is a set of agents and prosecutors who conduct the search of any property in the first instance and remove any privileged communications, prior to providing the remaining non-privileged materials to the prosecution team. This process can ensure that the prosecution team is not exposed to privileged evidence.

Cellebrite[4] sessions indicated that, on or about October 27, 2025, the same day that Agent Giarrusso first identified potentially attorney-client privileged material and alerted the prosecution team, Agent Giarrusso created a new tag for potentially attorney-client privileged material that was appended to the WhatsApp conversation thread between Messrs. Arnaud, Ortiz, and Ramon, but not the four messages within the thread that are at issue in the instant motion, (*id.* ¶ 6(b)). Based on this information, the Government asserts that the four messages were inadvertently produced to Mr. Ortiz because they otherwise were deemed "responsive." (*See* ECF No. 168 at 9.) Had the individual four messages been tagged as possibly privileged, they presumably would have been excluded from the "responsive cut." (*See id.*)

The Government represents that, "[t]o date, no prosecuting attorney has ever accessed or reviewed the four messages, let alone knows their content at any level of generality." (*Id.*) The only person who is part of the prosecution team who "has ever seen the messages," but did not understand their contents, is Agent Giarrusso. (*Id.*) Agent Giarrusso also "immediately stopped reviewing the [Subject Summary containing the translation] of the messages once she suspected [the Subject Summary] might contain [potentially privileged material]." (*Id.*) According to her

[4] Cellebrite is a "program used to review electronic devices." (Giarrusso ACP Aff. ¶ 5.)

affidavit, Agent Giarrusso neither retained substantive details about the messages, nor did she ever relay the substance of any messages to any other member of the prosecuting team. (Giarrusso ACP Aff. ¶ 10.)

Mr. Ortiz also objects that, after the Government filed a Superseding Indictment against Mr. Ortiz on February 2, 2026, and after Mr. Ortiz had already alerted the Government to the presence of purportedly attorney-client privileged material on January 6, 2026, the Government provided a copy of Mr. Ortiz's phone to counsel for Mr. Ortiz's co-defendant, Emmanuel Clase de la Cruz ("Mr. Clase"). (ECF No. 146 at 6-7.) Mr. Ortiz's counsel argues that the "post-notice dissemination [of privileged material] to [a] co-defendant[] cannot be [inadvertent]." (*Id.* at 7.)

The Government explains that it was responding to a request by Mr. Clase's counsel, sent on December 23, 2025, for "the entire contents of all phones acquired from any Bettor, whether through the execution of a search warrant or through voluntary consent." (ECF No. 168 at 5-6 (quoting Exhibit D).) The Court notes that Mr. Clase's counsel's December 23, 2025 request also sought, *inter alia*, "[a]ll alleged statements in furtherance of the alleged conspiracies," including those "[m]ade to induce Mr. Clase or Mr. Ortiz from joining or participating in the alleged conspiracies." (ECF No. 168-4 at 19.) Rather than object to Mr. Clase's December 23, 2025 request on grounds of attorney-client privilege,

"[w]ithin hours of [Mr. Clase's December 23, 2025] demands," Mr. Ortiz had sent his own letter, attached Mr. Clase's letter as an exhibit, and joined in Mr. Clase's demands. (ECF No. 168 at 5-6.). In response to Messrs. Clase's and Ortiz's requests, the Government agreed to provide full copies of all devices, though it acknowledged that such material was generally not discoverable. (*Id.* at 6.) Messrs. Clase and Ortiz provided the two terabyte drives that the Government had requested, and on January 13, 2026, the Government emailed counsel for Messrs. Clase and Ortiz a discovery letter clearly stating that the full extractions of "each of the defendants' devices, as well as all other devices" were being provided to Messrs. Clase and Ortiz. (*See id.* at 6-7.) The next day, the storage devices containing full extractions were shipped. (*See id.* at 6-7.) According to the Government, "[a]t no point in the days after receiving the [Government's] discovery letter but before receiving the device extractions did [Mr. Ortiz] object to the government's provision of full extractions of all devices" to Mr. Clase, nor did any defendant object after reviewing the discovery until the filing of the instant motion. (*See id.* at 7.)

**II. Purportedly Marital Privileged Communications**

On July 2, 2026, Mr. Ortiz moved to compel grand jury transcripts, for a *Kastigar* hearing, and for a *Voigt* hearing based on the Government's review of communications between Mr. Ortiz and

his wife. Between June 14, 2025, and July 11, 2025, Mr. Ortiz and his wife exchanged messages in Spanish on WhatsApp, [redacted] (ECF No. 182 at 2.) [redacted][5] (*Id.* at 3.)

The Government's brief and accompanying affidavit from Agent Giarrusso provides additional context for the Government's review of the WhatsApp text communications between Mr. Ortiz and his wife. On March 2, 2026, after the Indictment and Superseding Indictment in this case were returned in November 2025 and February 2026, respectively, Agent Giarrusso received a three-page summary draft translation of communications between Mr. Ortiz and his wife [redacted]. (*See* ECF No. 189-2, "Giarrusso Marital Priv. Aff." ¶ 10.) After reading the beginning of the summary, Agent Giarrusso came to understand that the communications may have involved Mr. Ortiz's wife and contacted a member of the prosecution team. (*Id.* ¶ 11.) The prosecutor directed Agent Giarrusso to determine whether Mr. Ortiz was legally married and to segregate the communications while the determination was made.

[5] In this Memorandum & Order, the Court does not make any findings as to whether the text communications between Mr. Ortiz and his wife are protected by the marital communications privilege. The Court recognizes that the version of Mr. Ortiz's brief served on the Government contains redactions as to the content of these messages. However, the Court has not applied redactions in this sealed version of the memorandum to protect Mr. Ortiz's purportedly marital privileged communications because the Government is clearly already in possession of them and knows their content. Any disclosure of privileged material, if any, within this Memorandum & Order shall not constitute waiver of the marital communications privilege, if any.

(*Id.* ¶ 13.) On March 5, 2026, the prosecution team determined there was a basis to believe that the communications were subject to the joint crime exception given Mr. Ortiz's wife's alleged receipt of a kickback payment on June 20, 2025, and authorized the FBI to release the communications to the prosecutors. (*Id.* ¶¶ 14-15.) [redacted] (*See* ECF No. 190 at 2-6.) On this basis, the Government argues that the communications between Mr. Ortiz and his wife are subject to the joint crime exception to the marital communications privilege. (*See id.* at 7.)

## <u>Legal Standards & Discussion</u>

### I. Motion to Compel Grand Jury Transcripts and for a *Kastigar* Hearing for the Government's Review of Purportedly Attorney-Client Privileged Communications

Mr. Ortiz asserts that the Government improperly reviewed attorney-client privileged communications. He requests a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), in which the Government would prove that the grand jury indictments were not procured using any purportedly privileged communications. To start, the only communications the Government could have

reviewed, and which could have tainted any evidence before the grand jury, were the four messages inadvertently included in the "responsive cut," and the Subject Summary translating those messages into English. The rest of the communications between Messrs. Ortiz, Arnaud, and Ramon were tagged and segregated as potentially attorney-client privileged material. (*See* ECF No. 146-1 at 5-6; *see* ECF No. 168 at 8-9.)[6]

The attorney-client privilege "protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*, 697 F.3d 184, 207 (2d Cir. 2012). The "underlying purpose" of the privilege "has long been 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (quoting *Upjohn Co v. United States*, 449 U.S. 383, 389 (1981)). To balance this "protection of confidentiality with the competing value of public disclosure," courts "construe the privilege narrowly" and

[6] Contrary to Mr. Ortiz's argument that any such invasion of his attorney-client privilege was intruded upon when the Government produced the full copies of his phone in full to him and his co-defendants at their request, the Court finds that the mere production of the cell phones' contents in full does not alone suggest that the Government reviewed the privileged communications, nor does this production change the Court's analysis *infra* under *Kastigar*.

"only where necessary to achieve its purpose." *Id.* (quoting *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007)).

"[F]or the privilege to attach," the party asserting privilege must establish "[t]he relationship of attorney and client, a communication by the client relating to the subject matter upon which professional advice is sought, and the confidentiality of the expression for which the protection is claimed." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997) (party asserting privilege has the burden of establishing all elements). "The person invoking the privilege must have [also] taken steps to ensure that it was not waived," *Mejia*, 655 F.3d at 134, and bears the burden of establishing the lack of waiver, *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 86 (S.D.N.Y. 2019). Ultimately, the test for deciding whether a communication is privileged is "whether the predominant purpose of the communication is to render or solicit legal advice." *In re Cnty. of Erie*, 473 F.3d at 420 (internal quotations omitted).

Entities like the MLBPA often employ their "own counsel to represent [their] interests." *United States v. Int'l Bhd. of Teamsters* (Nash), 119 F.3d 210, 214-15, 214 n.1 (2d Cir. 1997) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). By default, an individual does not have an attorney-client relationship with an entity's counsel. *Id.* at

214-17 (holding that a union member could not assert personally held attorney-client privilege over communications the union member had with a union lawyer, given that the member "neither sought nor received legal advice in his individual capacity," notwithstanding the member's testimony that he believed the lawyer to have been representing him personally). An individual may establish personal privilege over communications with entity counsel only by making it clear that he seeks counsel in his personal capacity. In *Nash*, the Second Circuit considered if the individual satisfied the Third Circuit's five-factor test, requiring a showing that (1) the individual "approached counsel for the purpose of seeking legal advice"; (2) he "made . . . clear that [he was] seeking legal advice in [his] individual rather than in [his] representative capacit[y]"; (3) counsel "saw fit to communicate with [him] in [his] individual capacity[y], knowing that a possible conflict could arise"; (4) the "conversations . . . were confidential"; and (5) the "substance of [the] conversations . . . did not concern matters within the company or [its] general affairs." *Id.* at 215. Absent an adequate showing that an entity lawyer and individual established a personal attorney-client relationship, the entity -- and not the individual -- is the ultimate holder of any privilege.

Mr. Ortiz has not carried his burden of establishing that his communications with Mr. Arnaud are protected by attorney-client

privilege. First, Mr. Ortiz has failed to establish an attorney-client relationship with Mr. Arnaud, who represents the MLBPA and not Mr. Ortiz personally. Mr. Ortiz has not adequately shown that he understood himself to be personally represented by Mr. Arnaud, that Mr. Ortiz understood himself to be seeking legal counsel from Mr. Arnaud in a personal capacity, and that Mr. Arnaud also communicated with Mr. Ortiz in his personal capacity. Accordingly, any existing attorney-client relationship was between Mr. Arnaud and MBLPA and the privilege cannot be asserted by Mr. Ortiz.[7] *See Nash*, 119 F.3d at 214-16. If anything, the fact that Mr. Ortiz did not identify Mr. Arnaud as his attorney and that Mr. Ortiz's counsel did not proactively notify the prosecution team of any potential attorney-client relationship including between Messrs. Ortiz and Arnaud, after seizure of Mr. Ortiz's phone and while the Government engaged in its responsiveness review, is supportive of

[7] Even if an attorney-client relationship existed between Messrs. Arnaud and Ortiz, the privilege may have been vitiated by the presence and participation of Mr. Ramon, Mr. Ortiz's player agent, in the WhatsApp thread. "It is well established that the attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship." *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004). Attorney-client privilege "can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client." *Mejia*, 655 F.3d at 132 (quoting *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995)). The Second Circuit has also "recognized that the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client." *United States v. Ackert*, 169 F.3d 136, 139-40 (2d Cir. 1999). In this Memorandum & Order, the Court does not reach the question whether Mr. Ramon's presence was "necessary" to improve the comprehension between Messrs. Arnaud and Ortiz.

the Court's conclusion that no personal attorney-client relationship existed between Messrs. Ortiz and Arnaud. Second, and also fatal to Mr. Ortiz's argument that his communications with Mr. Arnaud are privileged, the "predominant purpose" of the communications between Messrs. Ortiz and Arnaud, during which Mr. Ortiz's agent, Mr. Ramon, was present, was not to "render or solicit legal advice," *Erie*, 473 F.3d at 420; rather, Mr. Arnaud was facilitating a response by Mr. Ortiz to the MLB's informational inquiry. For those two independent reasons, Mr. Ortiz cannot assert attorney-client privilege over his communications with Mr. Arnaud.

The lack of an attorney-client relationship and any privilege establishes that no *Kastigar* violation occurred. In any event, even assuming, *arguendo*, that the communications between Messrs. Ortiz and Arnaud were privileged, for the reasons below, the Court finds that Mr. Ortiz has also failed to establish his entitlement to a *Kastigar* hearing.

In *Kastigar v. United States*, 406 U.S. 441 (1972), the Supreme Court had held that the Government may compel testimony from an unwilling witness who invokes his or her Fifth Amendment privilege against compulsory self-incrimination so long as the witness is given use and derivative use immunity under 18 U.S.C. § 6002. *Id.* at 460-61. If a witness is given such immunity, the prosecution would have the "affirmative duty to prove that the evidence it

proposes to use is derived from a legitimate source wholly independent of the compelled testimony" in a subsequent proceeding where the source of the information is in doubt. *Id.* To establish the Government's compliance with these duties, courts have "subsequently interpreted *Kastigar* to establish a specialized type of proceeding, called a '*Kastigar* hearing,' in which the Court can determine whether the Government's evidence was derived from legitimate sources." *United States v. Tournant*, 2023 WL 5276776, at *17 (S.D.N.Y. Aug. 15, 2023); *United States v. Allen*, 864 F.3d 63, 78-79 (2d Cir. 2017) (describing *Kastigar* hearing held by district court to determine whether witness testimony compelled by a foreign sovereign was used in procuring grand jury indictment).

Although the Second Circuit remanded for a taint hearing in *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991), which involved an alleged intrusion into the defendant's attorney-client privilege, there is "'no binding Second Circuit authority on the question of whether a *Kastigar* hearing is required' when a defendant alleges [such an] 'intrusion.'" *United States v. Combs*, 2025 WL 485377, at *4 (S.D.N.Y. Feb. 12, 2025) (quoting *Tournant*, 2023 WL 5276776, at *17); *see also United States v. Christian*, 111 F. Supp. 3d 287, 305 (E.D.N.Y. 2015), ("*Kastigar* applies only to testimony that is granted both use and derivative-use immunity because it was compelled over an invocation of the privilege against self-incrimination."), *aff'd sub nom. United States v.*

*Booker*, 825 F. App'x 4 (2d Cir. 2020) (summary order).

Assuming that the *Kastigar* hearing procedure is available to Mr. Ortiz here, who does not assert that the Government used any compelled testimony by any witness asserting a Fifth Amendment right against self-incrimination but rather that the Government intruded on his attorney-client and martial privileges, the defendant must first "show[] a 'factual relationship' between the privileged information and the prosecution" to establish his entitlement to a hearing. *United States v. Sharma*, 2019 WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019) (quoting *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998)). "'[A]n insubstantial and speculative possibility of taint' does not trigger *Kastigar*," and a defendant "must lay a firm 'foundation' resting on more than 'suspicion'" that immunized testimony tainted grand jury proceedings. *United States v. Connolly*, 2019 WL 2120523, at *19-20 (S.D.N.Y. May 2, 2019) (quoting *United States v. North*, 920 F.2d 940, 949 n.9 (D.C. Cir. 1990)).

Here, the purportedly privileged communications concerned an MLBPA lawyer's facilitation of a response from Mr. Ortiz, with his agent Mr. Ramon, pertaining to a July 2, 2025 information request from the MLB. That request sought information as to certain online sports bettors and two of Mr. Ortiz's pitches, which had been flagged by the MLB as suspicious. (ECF No. 146-1 at 2.) Mr. Ortiz was indicted for his participation in a pitch-rigging conspiracy

in November 2025, so he has adequately demonstrated a factual relationship between the purportedly privileged communications and the prosecution given that both concern Mr. Ortiz's alleged participation in a pitch-rigging scheme.

Mr. Ortiz, however, fails to demonstrate more than a "speculative possibility of taint" stemming from the Government's contact with the four messages. *Connolly*, 2019 WL 2120523, at *19. Mr. Ortiz points to the fact that the Government produced the four messages to Mr. Ortiz as part of its "responsive cut." (ECF No. 146-1 at 5.) But raising the possibility that the Government *reviewed* the communications and whether the Government's review of any communications *tainted* any evidence presented to the grand jury are distinct questions. The record is clear that both questions must be answered in the negative. As to the first question, the Government has made a substantial showing, including through affidavits by the FBI agent who first encountered these purportedly privileged communications and by the FBI agent on the filter team, that no member of the prosecution team has ever reviewed the four messages at issue. As to the second, whether evidence presented to the grand jury was tainted, the Government has shown that it never saw the disputed documents and thus could not have presented them to the grand jury. Moreover, Mr. Ortiz does not provide support for his speculative argument that any material from the four messages or the Subject Summary of

those messages tainted the Government's evidence before the grand jury.[8]

Even when defendants have sufficiently stated *Kastigar* violations -- which Mr. Ortiz has not -- courts in the Second Circuit have denied requests for *Kastigar* hearings where the record is sufficient to determine that the Government had independent and legitimate sources for the evidence submitted to the grand jury. *See United States v. Codner*, 2022 WL 3139119, at *5 (E.D.N.Y. Aug. 5, 2022); *United States v. Combs*, 2025 WL 485377, at *4 (S.D.N.Y. Feb. 12, 2025); *United States v. Boyd*, 404 F. Supp. 413, 416 (S.D.N.Y. 1975); *United States v. Ahmed*, 94 F. Supp. 3d 394, 438-39 (E.D.N.Y. 2015) (declining to conduct taint hearing and to disclose grand jury minutes to defendant where Government represented that "no evidence related or derived from Defendants' statements was presented" grand jury that returned superseding indictment).

Accordingly, for the avoidance of doubt, the Court has also

[8] Non-evidentiary uses of privileged material are inapposite here, given that the Second Circuit "has not endorsed the taint theory . . . that the Government's thought process or questioning of witnesses may have been influenced by its access to [privileged material]." *United States v. Landji*, 2021 WL 5402288, at *27 (S.D.N.Y. Nov. 18, 2021) ("[N]on-evidentiary, tangential use of [privileged material] would not constitute a *Kastigar* violation."); *see United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988) (mere "tangential[] influence[] [that privileged information may have on] the prosecutor's thought processes in preparing the indictment and preparing for trial" was not unconstitutional use). The Court also finds that, after reviewing the affidavits submitted by the Government and the grand jury transcripts, there is no evidence that the prosecution team reviewed or presented to the grand jury the purportedly attorney client privileged material.

reviewed the grand jury transcripts *in camera*, and finds that no *Kastigar* violation occurred. Neither the four messages nor the Subject Summary was mentioned in the grand jury proceedings, which is consistent with the Government's account that the prosecution team had not, and has still not, seen the purportedly privileged material. [redacted]

For the foregoing reasons, Mr. Ortiz's motion for a *Kastigar* hearing regarding his purportedly attorney-client privileged communications is **DENIED.** For the same reasons, his motion to compel the grand jury transcripts[9] so he can review them for any evidence of taint is also **DENIED.**

[9] Because grand jury proceedings carry a "presumption of regularity," *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974) (internal quotations omitted), "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct," *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990), *overruled on other grounds as recognized by*, *United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010). A party seeking disclosure bears the burden of establishing a "particularized need for disclosure" outweighing the policy of grand jury secrecy. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211. 223 (1979). "[M]ere speculation [is] not sufficient to satisfy this heavy burden." *United States v. Busch*, 2013 WL 3759944 at *11 (W.D.N.Y. July 15, 2013) (citing *United States v. Calandra*, 414 U.S. 338, 345 (1974)). "This standard applies equally to a defendant's request for the court to conduct *in camera* inspection of grand jury transcripts." *United States v. Laster*, 2007 WL 3070599, at *1 (S.D.N.Y. Oct. 19, 2007), *aff'd*, 313 F. App'x 369 (2d Cir. 2009) (summary order).

## II. Motion to Compel Grand Jury Transcripts, for a *Kastigar* Hearing, and for a *Voigt* Hearing Based on the Government's Review of Purportedly Marital Privileged Communications

Mr. Ortiz also asserts that the Government improperly reviewed Mr. Ortiz's marital-privileged communications with his wife. Although Mr. Ortiz and the Government agree that the elements of the confidential marital communications privilege are satisfied by the communications at issue, (*see* ECF No. 182-1 at 4-5; ECF No. 190 at 10 (both citing *United States v. Pugh*, 937 F.3d 108, 117 (2d Cir. 2018)), the parties diverge on the applicability of the joint crime exception, which strips protection from "[spousal] testimony concerning [communications] admissible as evidence of joint criminal activity." *United States v. Estes*, 793 F.2d 465, 467 (2d Cir. 1986).

The Court reserves its decision here on whether the communications between Mr. Ortiz and his wife are subject to the joint crime exception and will address the issue in its forthcoming memorandum and order addressing the parties' motions in limine.

Without opining on whether the communications are subject to the marital privilege, the Court again finds that -- though Mr. Ortiz has demonstrated a factual relationship between the purportedly privileged material and the prosecution -- Mr. Ortiz cannot demonstrate more than a "speculative possibility of taint" from the Government's review of any purportedly marital privileged communications with respect to either the November 2025 or February

2026 grand jury indictments, given that the prosecution team first came into contact with the claimed marital privileged communications in March 2026, after both indictments were returned. (Giarrusso Marital Priv. Aff. ¶¶ 10-15.) In any event, the Court has reviewed the grand jury transcripts and has confirmed that no *Kastigar* violation occurred.[10]

For the foregoing reasons, Mr. Ortiz's motion for a *Kastigar* hearing as to the Government's review of purportedly marital-privileged communications is **DENIED.** For the same reasons, his motion to compel the grand jury transcripts so he can review them for any evidence of taint is also **DENIED.**

### III. Motion for a *Voigt* Hearing for the Government's Review of Purportedly Marital Privileged Communications

Mr. Ortiz also requests a hearing pursuant to the non-binding Third Circuit decision in *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), based on the Government's purported intrusion on Mr. Ortiz's marital communications privilege. In *Voigt*, the defendant argued that the Government "infringed his Fifth Amendment right to due process by recruiting his attorney as a government informant in deliberate and flagrant disregard for the attorney-client

[10] The Court is also mindful that no court in this Circuit has ever extended *Kastigar* -- which concerned compelled testimony that has been granted use and derivative use immunity -- to the Government's use of documents that may implicate the marital-communications privilege. *See United States v. Landji*, 2021 WL 5402288, at *20 (S.D.N.Y. Nov. 18, 2021) (noting that there is "a dearth of law in the Second Circuit" on the issue of "a *Kastigar* claim premised on access to privileged materials").

relationship." *Id.* at 1061 (internal quotations omitted). The defendant's criminal scheme involved the use of a trust, which he controlled, during which the trust purportedly shared an attorney-client relationship with the government informant, who was an attorney. *Id.* at 1059-60. After the attorney notified the Government as to potentially criminal behavior by the trust and the defendant, the attorney, on the Government's request, "reingratiate[d] herself with the [t]rust" and further deepened the purported attorney-client relationship to help build the Government's case as to the defendant. *Id.* at 1061. The Government "maintain[ed] that it justly and reasonably believed that [informant] was not and had never been an attorney for the [t]rust." *Id.* The defendant had argued that recruiting the trust's attorney to gather incriminating information constituted "outrageous government conduct" in violation his Fifth Amendment rights to due process. *Id.* at 1059. The Third Circuit observed that, though the Supreme Court "continues to recognize a due process claim premised upon outrageous law enforcement investigative techniques," the claim requires "the proceedings by which [a] conviction was obtained do more than offend some fastidious squeamishness or sentimentalism about combatting crime too energetically," and must instead "shock the conscience." *Id.* at 1064-65 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). To raise a "colorable claim of outrageousness pertaining

to alleged governmental intrusion into the attorney-client relationship," the Third Circuit assessed "(1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice." *Id.* at 1067. Applying the three-part test to the facts in *Voigt*, the Third Circuit concluded that the district court "should have conducted an evidentiary hearing" as to whether the government's conduct had been outrageous, but nevertheless found the district court's error to be "unquestionably harmless" given that the trial record that subsequently developed gave the district court sufficient evidence with which to "measure [the defendant's] outrageousness claim." *Id.* at 1067-68.

The Second Circuit has not adopted the *Voigt* procedure, nor has any district court in the Second Circuit ever held a *Voigt* hearing. The Court also notes that no court in the Third Circuit appears to have applied the *Voigt* procedure to purported violations of the marital privilege, and the three-part test articulated by the Third Circuit explicitly cabins the analysis to intrusions on attorney-client privilege only. *See Voigt*, 89 F.3d at 1067 (requiring defendants to demonstrate an issue of fact regarding "the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the

defendant" and "deliberate intrusion into that relationship."). The Court declines to be the first district court in the Second Circuit to hold a *Voigt* hearing, and instead analyzes the "outrageousness" of the Government's conduct according to Second Circuit precedent.

In the Second Circuit, to establish "a claim of outrageous governmental conduct," "a defendant must establish that the [G]overnment engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the [G]overnment from prosecuting [him]." *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991). The remedy is dismissal of the indictment. *See id.* "[T]he existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience,' . . . regardless of the extent to which it led the defendant to commit his crime." *United States v. Chin,* 934 F.2d 393, 398 (2d Cir. 1991) (quoting *Rochin,* 342 U.S. at 172).

District courts in the Second Circuit have generally considered these claims in the context of purported entrapment by the Government. *See United States v. Kim*, 2017 WL 394498, at *2-3 (E.D.N.Y. Jan. 27, 2017) (no outrageous conduct when prosecutors allegedly operated child pornography website for weeks to track IP address of defendant); *United States v. Leonard*, 817 F. Supp. 286, 296-97 (E.D.N.Y. 1992) (no outrageous conduct when prosecutors

allegedly "target[ed] and induc[ed] [defendant] to commit the crime charged); *United States v. Romano,* 706 F.2d 370, 372 (2d Cir. 1983) (rejecting claim of outrageous government conduct where drug transaction initiated by government informant and government supplied the drugs); *United States v. Nunez-Rios,* 622 F.2d 1093, 1097-98 (2d Cir. 1980) (rejecting claim of outrageous government conduct where defendant argued that informant's initiation of drug transaction and supplying narcotics violated due process); *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) ("It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive. Likewise, feigned friendship, cash inducement, and coaching in how to commit the crime do not constitute outrageous conduct." (internal citations omitted)). As one case aptly noted, in both "circuit court cases" and "district court cases which have found outrageous conduct," "the government actively participated in the criminal enterprise." *United States v. Bin Laden*, 2001 WL 30061, at *7 (S.D.N.Y. Jan. 2, 2001); *Al Kassar*, 660 F.3d at 121 ("[T]o be 'outrageous,' the [G]overnment's involvement in a crime must involve either coercion or a violation of the defendant's person.")

As should be evident, in the Second Circuit, the standard for an outrageous government conduct claim is extremely high. *See United States v. Rahman,* 189 F.3d 88, 131 (2d Cir. 1999). This is

particularly true "in view of the courts' well-established deference to the Government's choice of investigatory methods." *Id.*; *see also United States v. Colon*, 71 F. Supp. 3d 269, 276 (D. Conn. 2014) ("[F]ederal courts -- even when faced with government methods they find unsavory or unwise" are not "at liberty to 'fashion their own sub-constitutional limitations on the conduct of law enforcement agents.'" (quoting *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996))). In fact, "a due process challenge to an indictment based on outrageous government conduct has almost never succeeded." *United States v. Williams*, 372 F.3d 96, 112 (2d Cir. 2004).

Although "courts in the Second Circuit have offered scant guidance on the factors to consider in evaluating a claim of 'outrageous government conduct,'" *United States v. Rich*, 83 F. Supp. 3d 424, 431-32 (E.D.N.Y. 2015), the Court observes that no district court in the Second Circuit has ever found the government's alleged violation of privilege to satisfy such a claim. *See United States v. Tournant*, 2023 WL 5276776, at *14 (S.D.N.Y. Aug. 15, 2023) (rejecting defendant's argument that government's intrusion on his attorney-client privilege was outrageous in part because defendant had not demonstrated "any manifest corruption or violation of his constitutional rights"); *United States v. Santopietro*, 809 F. Supp. 1008, 1015-16 (D. Conn. 1992) (finding that government conduct did not "shock the universal

sense of justice”). Here, the government did not actively participate in the criminal enterprise and did not “le[ad] the defendant to commit [the] crime.” *Chin*, 934 F.2d at 398. Furthermore, the Government’s conduct neither be said to “shock[] the conscience,” *Rochin*, 342 U.S. at 172, or be so “outrageous” so as to “involve either coercion or a violation of the defendant’s person,” *Al Kassar*, 660 F.3d at 121. To the contrary, the record is clear that Agent Giarrusso immediately ceased review of communications she believed may have been protected by the marital communications privilege and sought advice from the prosecution team. The prosecution team subsequently made the determination that the joint crime exception vitiated any marital privilege, instructed agents to resume review, and otherwise acted according to that determination. There is no Government conduct here so outrageous that it violated Mr. Ortiz’s due process rights according to Second Circuit precedent. Accordingly, Mr. Ortiz can neither establish a claim for “outrageous government conduct” nor entitlement to a *Voigt* hearing, and his request for the latter is respectfully **DENIED.**

## Conclusion

For the foregoing reasons, Mr. Ortiz’s motions to compel grand jury transcripts and for a *Kastigar* hearing as to both purportedly attorney-client privileged communications and purportedly marital privileged communications are respectfully **DENIED.** (*See* ECF Nos.

146, 182.) His motion for a *Voigt* hearing regarding the Government's review of purportedly marital privileged communications is also respectfully **DENIED.** (*See* ECF No. 182.)

The ex parte, sealed version of the Memorandum & Order was provided to the Government on October 7, 2026. The Government was ordered to propose redactions sufficient to protect the secrecy of grand jury proceedings by **October 8, 2026** at **noon** for the version of this Memorandum & Order to be provided to Mr. Ortiz. Mr. Ortiz shall propose additional redactions, if any, by **October 13, 2026,** for the version of this Memorandum & Order that will be disclosed to his co-defendants and the public.

**So ordered.**

Dated: October 7, 2026
Brooklyn, New York

**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York